UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR ONLINE PUBLICATION ONLY

TAMARA NELSON,

                                        Plaintiff,

            - versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                                        Defendant.

**MEMORANDUM
AND ORDER**
14-CV-1109 (JG)

APPEARANCES:

      TAMARA NELSON
          212 Crown Street
          Apartment 2E
          Brooklyn, NY 11225
      By:   *Plaintiff pro se*

      LORETTA E. LYNCH
          United States Attorney
          Eastern District of New York
          271 Cadman Plaza East
          Brooklyn, NY 11201
      By:   Karen T. Callahan
          *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

## PRELIMINARY STATEMENT

When Tamara Nelson was four years old she went into a coma for four days.  R. 407.  She was diagnosed with diabetes mellitus type I, R. 407, and she has taken insulin four times per day ever since.  R. 289.  Based on that diagnosis, she was found to be disabled in 1996, when she was five years old, and she was awarded Social Security Income benefits.  R. 400.

Tamara left school after eighth grade in 2005, when she was fifteen years old, at the principal's request. R. 409-10.  The principal asked her mother to sign a release form and

take Tamara out of school because she was always sick due to her diabetes and because she could not talk to people at school.  R. 409.  That was the end of Tamara's education; she has been at home with her mother and sister ever since.  R. 410.

Long before it became one of the reasons for her leaving school, Tamara was unable to speak outside her home.  The record suggests that Tamara's muteness has been a problem since 1999.  *See* R. 318 (2011 report reflecting "a consistent failure to speak in specific social situations for almost 12 years").  Her inability to speak outside of her home causes her considerable anxiety, impairs her "ability to relate adequately with others," and standing alone, that is, without consideration of her other severe impairments, "significantly interfer[ed] with her ability to function on a daily basis" as early as 2009.  R. 239-40 (February 2009 report of examining psychiatrist, Dr. Heidi Van Horne).

Tamara's physical and nonexertional problems continued to mount after she was withdrawn from school.  As the Commissioner of Social Security (the "Commissioner") admits, her severe impairments – in addition to diabetes and selective mutism – include hyperthyroidism, Grave's disease, depression, and irregular heart rhythm.  *See* R. 27, 426.  It is also undisputed that Tamara suffers from blurred vision, see R. 385, 412-13, though the Commissioner does not acknowledge this.

When Tamara turned eighteen years old, the Commissioner was required to reassess her eligibility for social security benefits.  Despite all of her limitations, Tamara was found not disabled.  In this action, she seeks review of the Commissioner's denial of her application for Social Security Income benefits under the Social Security Act (the "Act").

In the ALJ's decision, he concluded that Tamara could be a hand packager, assembler of small products, or retail price marker.  R. 32.  But the vocational expert testified to

the exact opposite regarding small product assembly once Tamara's specific limitations were taken into account, and her testimony on the price marking job was equivocal.  R. 416-17.  And the ALJ acknowledged that the combination of physical impairments and the eighth grade education constituted a "significant barrier to jobs" if Tamara's muteness is "not controllable." R. 418-19.

The ALJ found Tamara's muteness "mysterious," and admitted he did not know if it was "controllable," but he nonetheless concluded that Tamara was "choosing not to" speak.  R. 413-14.  Since the record establishes (1) an inability to speak stretching back 13 years before the ALJ's decision, (2) a request from Tamara's middle school principal seven years before the ALJ's decision that Tamara be permanently removed from school based in part on her inability to speak there, (3) Tamara did not speak at her hearings or in court and communicates with her doctors only through her mother, and (4) the muteness causes Tamara anxiety, there is simply no basis for ALJ's conclusion that her muteness might be "intentional."  *See* R. 318, 410, 414.  Yet the Commissioner persists in that view even in this Court; her counsel contended at oral argument that "we may all be disabled if we just didn't want to talk to people."  Tr. 8 (Nov. 7, 2014).  That position reflects a callous disregard of Tamara's condition and the record before me.

Finally, the Commissioner ignored the escalating effects of Tamara's diabetes. Before the second hearing in front of the ALJ, Tamara submitted medical records showing she was "not responding to current treatment."  R. 372 (Sept. 26, 2011 visit).  Then, in the months before the ALJ's decision, her doctor twice wrote as follows: "The problem is getting worse. Risk factors include: African American race.   She has been managed with insulin.  Pertinent negatives include blurred vision, constant hunger, excessive thirst, foot ulcers, frequent infections, frequent urination, increased fatigue, chest pain, dyspnea, nocturia, dysesthesias, slow

healing wounds/sores, tooth/gum disease, weight loss, weight gain, diarrhea, burning of extremities, hypoglycemic episodes or heartburn." R. 382 (March 15, 2012 visit), R. 385 (April 18, 2012 visit). Yet the ALJ ignored those statements even as he relied on other statements in the same reports.

There is no indication here that Tamara "just [doesn't] want to talk to people." An array of very serious afflictions combines to impose an insuperable barrier to employment. Thus, I remand for the sole purpose of calculating benefits.

BACKGROUND

A.      *Facts and Procedural History*

Tamara was born in October 1990. R. 94. As mentioned above, she was found to be disabled at age five. After she turned eighteen years old, the Commissioner was required to redetermine her eligibility for benefits under the criteria used to determine initial eligibility for adults. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii). To be entitled to benefits as a disabled adult, Tamara needed to show she met the income and resource requirements of 42 U.S.C. §§ 1382a and 1382b, and that she was "unable to engage in any substantial gainful activity by reason of a physical or mental impairment" that is expected to last for at least one year. 42 U.S.C. § 1382c(a). When the Commissioner reviewed Tamara's case under the adult disability standard, Tamara was initially found no longer eligible for benefits. R. 41-44. After Tamara requested reconsideration, a hearing before a hearing officer was held on November 18, 2009. The hearing officer determined that Tamara was no longer disabled under the adult disability standard. R. 82-107. Tamara thereupon requested a hearing before an ALJ.

On May 18, 2011, and June 14, 2012, Tamara appeared before ALJ Edward Hein to contest the decision that she was no longer disabled. R. 394, 425. On both occasions, Tamara

appeared without counsel but with her mother, Maureen Nelson, who spoke on behalf of her daughter.  *See* R. 396-98, R. 425.  In a decision dated August 31, 2012, the ALJ found that Tamara's disability ended on April 22, 2010.  R. 32.  On December 20, 2013, Tamara's request for review of the ALJ's decision was denied, R. 5-8, at which point it became the final decision of the Commissioner.

On February 20, 2014, Tamara filed a *pro se* complaint requesting review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner moved for judgment on the pleadings upholding her decision to terminate Tamara's benefits because she did not satisfy the adult disability standard.  I heard oral argument on November 7, 2014.  At oral argument, Tamara was accompanied by her mother, who spoke on her behalf.  For the reasons that follow, the Commissioner's motion is denied and the case is remanded solely for the calculation and award of benefits.

B.      *The ALJ's Decision*

1.      *The Legal Standards*

The Act provides that a person is disabled if he or she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  Additionally, an individual is disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] . . . cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B); *see also Melville v. Apfel*, 198 F.3d 45, 50-51 (2d Cir. 1999).

The Social Security Administration's regulations prescribe a sequential five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982)) (alterations omitted); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, and the burden shifts to the Commissioner in the last. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

2. *The ALJ's Findings*

At step one of the analysis described above, the ALJ found that Tamara – who has never engaged in substantial gainful activity – was notified that she was found to be no longer disabled as of April 22, 2010, based on a redetermination of her disability status. R. 27. At step two, he found that Tamara suffers from "severe impairments" as defined by 20 C.F.R. § 416.920(c), including diabetes mellitus type I, Grave's disease, hyperthyroidism, selective

mutism, and depression.  R. 27.[1]  At step three, the ALJ found that those severe impairments, alone or in combination, did not meet and were not medically equal in severity to one of the impairments listed in 20 C.F.R. § 404 Subpart P, Appendix 1, which required him to determine Tamara's residual functional capacity ("RFC").  R. 28.

In that regard, the ALJ found that Tamara could perform light work as defined in 20 C.F.R. § 416.967(b), limited to simple routine work using all postures occasionally and communicating with strangers selectively.  R. 29.  In the explanation of this finding, the ALJ said "the claimant's assertions that the intensity, persistence, and limiting effects of these symptoms are more restrictive than the above residual functional capacity assessment are not supported by the objective medical evidence and, therefore, are not credible."  R. 29.

At step four, the ALJ observed that there was no past relevant work to consider. R. 31.  At step five, based on the testimony a vocational expert, he determined that there were jobs that exist in significant numbers that Tamara could perform "even if mute."  R. 32.  Those jobs were hand packaging, small product assembly, and retail price marker.  R. 32.  Accordingly, the ALJ determined that Tamara was not disabled.  R. 32.

C.        *The Evidence*

The record consists of hearing testimony, medical records, and additional evidence submitted by Tamara.  I discuss below the evidence as it relates to the ALJ's determination of Tamara's RFC and his finding that Tamara's testimony was not credible.

1.        *Hearing Testimony*

During the May 2011 hearing, when the ALJ summarized the medical evidence related to Tamara's mutism, he said that the examining physician, Dr. Ammaji Manyam,

---

[1]        The ALJ also acknowledged that Tamara suffers from an irregular heart rhythm, see R. 426, but that did not appear in his findings.

concluded that Tamara "is keeping herself mum.  It's what they call selective dumbness, meaning silence, and inability to talk . . ."  R. 411 (citing Exhibit 15F at R. 315).  The ALJ said that Dr. Manyam and Dr. Christopher Flach, the examining psychiatrist, did not find enough evidence to support the conclusion that the conditions were serious enough to limit Tamara's ability to work.  R. 411.  The ALJ noted that the medical source statement from Dr. Manyam found all of Tamara's impairments to be mild except the ability to make complex work-related decisions and respond appropriately to changes in routine, which were listed as moderate impairments.  R. 411-12.

In his examination of the vocational expert, the ALJ stated, "[T]here's nothing in here in terms of a limitation caused by this mutism, which is a little mysterious."  R. 413. Continuing the discussion of Tamara's mutism, the ALJ said, "I'm not quite sure to what extent this is voluntary or not," noting that Tamara speaks to her mother and sister, but not strangers, doctors, or the ALJ himself during the hearing.  R. 414.  The ALJ asked the vocational expert what effect "dumbness" would have on Tamara's ability to work, and the vocational expert testified, "[I]t eliminates jobs where communication, verbal communication, is required, but . . . the ability to speak is not required for all jobs."  R. 414.  The ALJ next asked about the ability of Tamara to obtain a job without the ability to speak to strangers:

> Q:  Okay.  So let me ask you this then.
> A:  There is the issue of having an initial interview, to be hired for a job or we're putting that aside?
> Q:  Yeah, I mean I think we have to look with and without.  So without the muteness, all right?
> A:  Yes.

R. 415-16.

When the vocational expert continued to testify about what work Tamara could perform given all her limitations except muteness, the expert mentioned hand packaging, small

product assembly, locker room attendant, and retail price marker. R. 416-17. The expert said if a person were mute, that would rule out locker room attendant but not packager, R. 417, and it would not "necessarily" rule out price marker. R. 417. However, once the ALJ reminded the vocational expert of Tamara's inability to sit for over two hours, the expert eliminated the small product assembly job. R. 416.

Making further comments about the effect of muteness, the ALJ said, "[R]ight now it looks to me like in terms of what jobs Tamara might or might not be able to do, the eighth grade education is a very limiting factor and the muteness, if it's not controllable or if she can't bring herself to speak to other people that she doesn't know . . . would be a significant barrier to jobs." R. 418-19. However, the ALJ did not consider the effect of Tamara's mutism any further, nor did he continue the discussion of how Tamara would be able to secure or maintain employment given her limitations. Indeed, the ALJ never concluded whether he thought Tamara's mutism was voluntary or not.

The ALJ attempted to examine Tamara, who did not give audible responses. He also asked Tamara's mother about her daughter's additional limitations. Tamara's mother testified that her daughter went to school only to the eighth grade because the principal asked to have Tamara released from school since she "was always sick at school [due to her diabetes] and she wasn't speaking, so most times she was reluctant to go to school." R. 409. Tamara's mother also testified about Tamara's additional symptoms that would prevent her from working, which include blurred vision (R. 413), swollen feet and numbness in her fingers (R. 419), shortness of breath (R. 420), no sense of direction, and an inability to travel alone (R. 421).

2.    *Medical Evidence Related to Mutism*

In reports of their physical and mental examinations, the physicians and psychiatrists made it clear that Tamara's inability to speak affected her demeanor and responsiveness. In a psychiatric evaluation in February 2009, Dr. Heidi Van Horne stated that "because she did not speak, this affected her ability to fully communicate her thoughts to the evaluator" and her thought process was "[d]ifficult to assess." R. 238. In Dr. Van Horne's medical source statement, she wrote that Tamara was unable to speak outside the home, and she concluded as follows: "The results of the present evaluation appear to be consistent with psychiatric problems that are significantly interfering with her ability to function on a daily basis, specifically her anxiety that is resulting in her selective mutism." R. 239-40.

After a consultative physical exam in April 2011, Dr. Manyam noted that Tamara does not speak except to her mother and sister. R. 312. Tamara's mother reported Tamara's information to the doctor. R. 312, 30. Dr. Flach also conducted a consultative psychiatric exam in April 2011, and he reported that Tamara "seemed to have a consistent failure to speak in specific social situations for almost 12 years, including school. Disturbances seemed to have interfered both educationally, occupationally and achievement." R. 318. Dr. Flach reported that Tamara does "no laundry, no shopping," and "mom does all those tasks," and Tamara "does not take public transportation on her own. She apparently gets lost. Apparently, she is not socializing very much. She does not go out." R. 319. In the medical source statement, Dr. Flach said Tamara has "difficulty relating adequately with others and problems dealing with stress," results that are "consistent with some psychiatric problems" that mildly to moderately affect Tamara's ability to function on a daily basis. R. 319.

3.     *Additional Evidence from Tamara*

The ALJ convened a second hearing in June 2012 to hear evidence about additional symptoms related to Tamara's diabetes. Tamara's mother testified that Tamara suffers from such serious cramps that she cannot get out of bed, for which she had seen a doctor but had not yet received a diagnosis. R. 428. She also testified that Tamara had started taking GED classes but was not able to continue them because of a thyroid infection and high blood sugar. R. 432. Tamara's additional medical records included: (1) records from Dr. Omesh Jhagroo documenting Tamara's struggles with complications from diabetes, including her complaints of blurred vision, foot ulcers, frequent infections, increased fatigue, and chest pain (R. 368-70, 382-88); (2) records from Dr. Yevgenly Kantor that show she was not responding to the current treatment and that her diabetes and hyperthyroidism were poorly controlled (R. 371-75, 380-81); and (3) records from an inpatient visit to Kings County Hospital in August 2012 (R. 389-93).

Tamara submitted letters to the ALJ and to this Court. In May 2011, she wrote to the ALJ that her mutism is "ruining her life," and that she "would never purposefully mute [her]self." R. 229. In October 2011, she submitted a letter that listed her current medications and ailments, including hyperthyroidism, irregular heart rate, difficulty standing and walking for long periods of time, chest pains, and abdominal pains. R. 365-66, R. 426. More recently, Tamara submitted a letter to this Court (during oral argument) that stated her mutism is no longer "selective" and she no longer speaks to anyone. *See* ECF No. 17 (Nov. 10, 2014). Additionally, she related other symptoms she is experiencing, including episodes of asthma that leave her unable to breathe, and an inability to sleep at night. *Id.*

DISCUSSION

A.       *The Standard of Review*

Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The first inquiry is whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citation omitted). The second inquiry is whether Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also id.* ("Substantial evidence is more than a mere scintilla.") (internal quotation omitted). The hearing on disability benefits is a nonadversarial proceeding, and the ALJ "has an affirmative obligation to develop the administrative record." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted).

In conducting my review, I am mindful that "the Social Security Act is a remedial statute which must be 'liberally applied,' its intent is inclusion rather than exclusion." *Vargas v. Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990) (citation omitted). Moreover, when a claimant is unrepresented by counsel, "the ALJ has a duty to probe scrupulously and conscientiously into and explore all of the relevant facts . . . ." *Melville*, 198 F.3d at 51.

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A

remand for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations," *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004), or "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)). Alternatively, where the record establishes "persuasive proof of disability and remand for further evidentiary proceedings would serve no purpose," the court should remand solely for the calculation and payment of benefits. *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir. 1980).

B.       *Errors Committed by the ALJ*

As discussed above, the ALJ's decision was based on his conclusions that Tamara, despite her various impairments, retains the capacity to perform light work, and that her testimony about her symptoms was not credible. These conclusions are not supported by substantial evidence.

1.       *Evaluation of Tamara's RFC*

A claimant's residual functional capacity ("RFC") is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). It is based on all the relevant evidence in the claimant's record. *Id.* "The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine the Plaintiff's RFC." *Fernandez v. Astrue*, No. 11-CV-3896 (DLI), 2013 WL 1291284, at *16 (E.D.N.Y. Mar. 28, 2013) (citation omitted). A claimant's RFC should take into consideration her physical abilities, mental abilities, and "other abilities affected by impairment(s)." 20 C.F.R. § 404.1545(b) – (d). "Other abilities" include impairments to "vision, hearing or other senses,

and impairment(s) which impose environmental restrictions, [and] may cause limitations and restrictions which affect other work-related abilities." 20 C.F.R. § 404.1545(d).

The ALJ's determination that Tamara can perform "a full range of light work" is not supported by substantial evidence. The ALJ cited reports from physicians about Tamara's abilities, but he did not take into account the effects of the impairments noted in those reports. For example, in his psychiatric examination report, Dr. Flach noted that Tamara "seemed to have a consistent failure to speak in specific social situations for almost 12 years, including school. Disturbances seemed to have interfered both educationally, occupationally and achievement." R. 318. "Seemed to have interfered" was actually an understatement – one of the two reasons Tamara's mother was asked by her middle school principal to sign her out of school permanently in the eighth grade was her inability to speak to others. Dr. Flach also reported that Tamara does "no laundry, no shopping," and "mom does all those tasks." He further noted that Tamara "does not take public transportation on her own. She apparently gets lost. Apparently, she is not socializing very much. She does not go out." R. 319.

In addition to the chronic debilitating effects of her lifelong battle with diabetes, and the adverse effects of hypothyroidism, Grave's disease, depression, and blurred vision, these medical reports that Tamara cannot speak and cannot leave her home except when accompanied by her mother fatally undermine the ALJ's determination that Tamara can perform "a full range of light work."

The ALJ also mischaracterized the testimony of the vocational expert, resulting in erroneous findings. Specifically, he concluded as follows: "The vocational expert testified that given all of these factors the individual, even if mute, would be able to perform the requirements of representative occupations such as: 1) handpackaging . . .; 2) assembly, small products . . .; 3)

retail price marker . . .” R. 32. But in fact the expert testified that, given the posited RFC, which included an ability to sit for up to two hours, Tamara could *not* perform small assembly jobs: “I don’t know if [Tamara] really could do assembly. More of the assembly jobs require sitting for at least six of the hours. There may be a very small percentage where a person has the option of sitting or standing longer than those.” R. 416. That testimony cannot support a finding that Tamara can perform small assembly jobs that “exist[] in significant numbers in the national economy.” R. 32.

Similarly, as to the price marker position, the expert testified only that Tamara’s muteness would not *necessarily* rule out such work for her. R. 417. The ALJ did not follow up on that equivocal response, which does not support his finding.

Finally on this topic, the ALJ simply ignored a matter that the vocational expert herself brought up at the outset of her testimony about Tamara’s ability to work. The expert asked the ALJ as follows: “There is the issue of having an initial interview, to be hired for a job, or we’re putting that aside?” R. 415. The ALJ instructed her to put that issue aside. R. 415-16. Although the ALJ later asked the expert what effect Tamara’s mutism would have on her ability to *perform* certain jobs, he never returned to the question of how she might possibly obtain those jobs. When pressed on that issue at oral argument, the Commissioner’s argument reduced to a claim that the muteness is a “questionable impairment,” Tr. 7 (Nov. 7, 2014), and that Tamara is not “incapable of communicating.” *Id.* at 8. That contention cannot be reconciled with the record evidence of that impairment beginning as early as 1999, and with the fact that Tamara’s mutism, and the anxiety it produced in her, resulted in her permanent withdrawal from school fully seven years before the ALJ’s decision.

The ALJ also erred by ignoring critical evidence that Tamara's impairments were having progressively worse effects on her. He wrote as follows in his decision denying benefits: "On [sic] April 18, 2012, examination by treating source Omesh Jhagroo, M.D., showed the claimant appeared well nourished, well developed and hydrated, eyes, nose, mouth, and throat were all normal, respiratory normal to inspection, cardiovascular was at a regular rate, abdomen normal and the right foot/ankle had swelling. *There were no complications associated with diabetes mellitus* (Exhibit 22F at 19-21)." R. 31 (emphasis added). But the exact pages cited by the ALJ also include the following report, which the ALJ simply ignored: "1. diabetes: The problem is getting worse. Risk factors include: African American race. She has been managed with insulin. Pertinent negatives include blurred vision, constant hunger, excessive thirst, foot ulcers, frequent infections, frequent urination, increased fatigue, chest pain, dyspnea, nocturia, dysesthesias, slow healing wounds/sores, tooth/gum disease, weight loss, weight gain, diarrhea, burning of extremities, hypoglycemic episodes or heartburn." R. 385 (Exhibit 22F at 19). Those same symptoms appeared for the first time in Dr. Jhagroo's report a month earlier (R. 382), and demonstrated the increasingly debilitating effects of Tamara's condition in the months leading up to the ALJ's August 2012 decision.

2.      *The Adverse Credibility Determination*

The ALJ's credibility assessment was also flawed. To decide whether a claimant is disabled, the Commissioner must consider the subjective evidence of pain and disability testified to by the claimant. *See* 20 C.F.R. § 416.929(a). "It is within the discretion of the [Commissioner] to evaluate the credibility of the plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true

extent of such symptomatology." *Gernavage v. Shalala,* 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995).

To assess a claimant's assertions of pain and other limitations, the regulations provide a two-step process. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). At the second step, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(a)).

Seven factors are used in evaluating a claimant's subjective complaints: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vii). *See Webster v. Colvin*, No. 13-CV-2580 (JG), 2014 WL 183936, at *14-15 (E.D.N.Y. Jan. 14, 2014) (going through this analysis).

If the ALJ decides a claimant's testimony is not credible, the ALJ must set forth the reasons "with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988) (citation omitted). *See*

*also Ligon v. Astrue*, No. 11-cv-0162, 2012 WL 6005771, at *17 (Dec. 3, 2012) ("[T]he adjudicator must . . . give specific reasons for the weight given to the individual's statements.") (citation omitted).

In this case, the ALJ found that Tamara's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Tamara's "assertions that the intensity, persistence, and limiting effects of these symptoms are more restrictive than the . . . [RFC] assessment are not supported by the objective medical evidence and, therefore, are not credible." R. 29.

I am mindful that "[i]t is the function of the [Commissioner], not [a reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) (alterations added). However, I nevertheless conclude that the adverse credibility determination here is not supported by substantial evidence.

First, the ALJ's logic – that Tamara's statements concerning the intensity, persistence, and limiting effects of her impairments were not credible to the extent they described limitations greater than the ALJ's RFC assessment – misapprehends the role of a claimant's subjective complaints. The Seventh Circuit has properly rejected this logic on the ground that it "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence, and limiting effects of her symptoms. It makes little sense to decide on a claimant's RFC first, before assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief.

Moreover, there is significant evidence in the record that Tamara suffers from impairments that are more restrictive than the ALJ's RFC assessment reflects. Her mother's testimony that Tamara is unable to go out on her own is uncontroverted, and it is substantiated in the psychiatric evaluation from Dr. Flach. *See* R. 319. Moreover, the ALJ did not make a determination about whether Tamara's muteness was voluntary, or even consider the effect of that muteness on her ability to obtain and maintain employment. He simply discontinued testimony on that subject, apparently finding it not relevant to Tamara's ability to work. The ALJ inexplicably discounted evidence that Tamara has not spoken outside the home for at least seven years – and perhaps up to *twelve years* – before his decision. *See* R. 318, 409-10. Instead, he suggested that her inability to speak was "controllable" and even "intentional." R. 414. That view was echoed by counsel for the Commissioner at oral argument, who said, "[W]e may all be disabled if we just didn't want to talk to people." Tr. 8 (Nov. 7, 2014).

The suggestion that Tamara has been faking an inability to speak since elementary school is inconsistent with the weight of the evidence and with common sense. It is also inconsistent with Tamara and her mother's appearance in my courtroom for oral argument, which the cold transcript of that proceeding cannot adequately reflect. In short, Tamara's uncontroverted limitations are inconsistent with the ALJ's decision that she is able to perform light work, and the ALJ has failed to put forward any evidence from the record to substantiate his finding that Tamara's testimony should be discredited.

C.      *Remedy*

I have carefully considered the factors that inform the decision whether to remand for further proceedings or solely for the calculation of benefits. *See, e.g.*, *Butts v. Barnhart*, 388 F.3d 377, 385-87 (2d Cir. 2004). If remand occurs because the ALJ applied an improper legal

standard, because there are gaps in the administrative record, or for other similar reasons, reconsideration of whether the claimant is disabled is usually appropriate. *See Butts*, 388 F.3d at 385-87; *see also Rivera v. Sullivan*, 923 F.2d 964, 970 (2d Cir. 1991). Remanding a case for the calculation of benefits is appropriate where there is no basis to conclude that a more complete record would support the Commissioner's decision. *Butts*, 388 F.3d at 386; *Parker*, 626 F.2d at 235; *see also Primiani v. Astrue*, No. 09-cv-2405 (JG), 2010 WL 474642, at *10 (E.D.N.Y. Feb. 5, 2010). In considering whether to remand a case for further proceedings or the calculation of benefits, I may also consider whether further delay would present a hardship to the claimant. *See Butts*, 388 F.3d at 387. As the termination of Tamara's benefits began over five years ago, I consider further hardship to her as a factor in my decision.

With an eighth grade education, diabetes, mutism, hyperthyroidism, Grave's disease, depression, irregular heart rhythm, and no capability of furthering her skills or training, Tamara cannot be expected to secure or maintain gainful employment. She struggles each day with a host of symptoms and limitations that disable her from engaging in many activities of everyday life. That she can sometimes go online or out shopping with her family does not alter the inescapable conclusion that her impairments prevent her from engaging in gainful employment. *See Vargas*, 838 F.2d at 296 (remand only for calculation of benefits appropriate where it was obvious that there was an "infinitesimal likelihood that employment of any kind would be available" for claimant). Because in my view the Commissioner (1) improperly determined Tamara's residual functional capacity, and (2) improperly rejected Tamara's subjective evidence about her limitations, there is no basis to conclude that a more complete record might support the Commissioner's decision, and a remand solely for the calculation of benefits is warranted.

CONCLUSION

For the reasons explained above, the Commissioner's motion is denied and the case is remanded to the Commissioner solely for the calculation and award of benefits.


So ordered.


John Gleeson, U.S.D.J.

Dated: December 31, 2014
       Brooklyn, New York